

# COURT OF APPEALS
## SECOND DISTRICT OF TEXAS
## FORT WORTH

### NO. 2-09-028-CV

IN THE INTEREST OF K.P., A CHILD

------------

FROM THE 323RD DISTRICT COURT OF TARRANT COUNTY

------------

## MEMORANDUM OPINION[1]

------------

### Introduction

Appellants B.P. (Mother) and C.P. (Father) separately appeal the trial court's order terminating their parental rights to their child, K.P.[2]  In three issues, Mother contends that the trial court abused its discretion by denying her

---

[1] *See* Tex. R. App. P. 47.4.

[2] The names of the parties involved in this appeal have been replaced with initials.  *See* Tex. R. App. P. 9.8(b); Tex. Fam. Code Ann. § 109.002(d) (Vernon 2008).  We will refer to B.P. as Mother, C.P. as Father, and B.P. and C.P. collectively as "the parents" in the remainder of this opinion.

motions to extend the statutory dismissal deadline and for a continuance and that the evidence is factually insufficient to prove that termination of her parent-child relationship is in K.P.'s best interest. Father contends in two issues that the trial court abused its discretion by denying his motion to extend the statutory dismissal deadline (of which he joined with Mother) and that the evidence is legally and factually insufficient to prove that termination of his parent-child relationship is in K.P.'s best interest.[3] We affirm.

## Background Facts

On January 11, 2008, the Texas Department of Family and Protective Services (the Department) received a referral from John Peter Smith Hospital that a child, K.P., had been born with cocaine in his meconium four days earlier. The Department assigned an investigator to the referral, appointed Jeanette Leong as its caseworker, removed K.P. from his parents' custody, placed him in foster care, and filed a petition for K.P.'s protection when he was a week old.[4] The parents answered the Department's petition through general denials.

---

[3] Because Mother's and Father's issues are similar and relate to the same portions of the record, we will address them together.

[4] The Department's petition sought termination of the parents' rights if reunification could not be achieved. The trial court signed an order authorizing K.P.'s removal and naming the Department as K.P.'s temporary managing conservator.

While conducting its investigation on the day it received the referral, the Department discovered that Mother, who was twenty-three years old at K.P.'s birth, had a previous case with the Department in Kerrville involving her other two children.[5] Mother admitted to a history of drug use, including attending a party in May 2007 in which she used methamphetamine and cocaine. Although Mother initially told an investigator that she had stopped using drugs when she discovered she was pregnant, she later admitted that she used cocaine as recently as one month before K.P.'s birth. Father told the investigator that he had used marijuana a year and a half to two years before K.P.'s birth.

Mother had begun Community Addiction Treatment Services (CATS)[6] in August 2007 as a result of her previous case in Kerrville. But Mother used methamphetamine while attending CATS, and she left the program three months later after completing only half of the program's sessions.

---

[5] During the course of this case, Mother voluntarily relinquished her parental rights to her two other children.

[6] CATS, a division of Mental Health and Mental Retardation (MHMR), is an outpatient drug treatment program.

3

Leong created separate service plans for Mother and Father, and she explained those plans to them in January 2008.[7] They agreed to complete their plans.

The Department recommended that Mother complete inpatient treatment for her drug problems, but Mother refused because she does not "do well in a lock-up setting." Instead, Mother voluntarily joined the Family Drug Court Program (the Program). In doing so, she agreed to complete the Program "to the satisfaction of the Court, including faithful attendance" at all counseling sessions.

The Program provided Mother with immediate specialized services,[8] and it allowed Mother two-hour visits with K.P. twice per week, compared to a normal Department case, in which a parent receives a one-hour visit once per week. Mother received time and budget management instruction as part of the Program, but issues related to her bipolar disorder were never resolved.

---

[7] The Department filed the parents' service plans in March 2008. The service plans expressed the parents' need to stay drug-free, complete drug-related programs and other programs and evaluations, and visit K.P. at least once per week.

[8] For instance, she received psychiatric services not routinely made available for parents involved in Department cases because she was enrolled in the Program, and she had a larger support team to provide transportation and other needs.

4

The Program required Mother to attend twenty-eight group meetings and four individual meetings. Father was not eligible to officially be part of the Program because it was designed for mothers and children, but he did benefit from Mother's involvement because he was allowed to attend team meetings and treatment sessions, and he was able to enjoy the extended visitation periods allowed by the Program.

In March 2008, the Department placed K.P. with Father's grandmother (Great-Grandmother), who lived next door to the parents. Mother visited K.P. consistently through April 2008, when she started working about thirty-five hours per week as a cashier at Wal-Mart.

During Mother's time in the Program, Father experienced serious medical problems—he had emergency surgery to remove his appendix on the day K.P. was born, he was hospitalized three or four times for more than a month cumulatively for various medical issues, and he had numerous doctor visits. The Department did not provide Father with counseling for the management of his time, budget, or anger, which he requested but was not part of his service plan. Father took parenting classes and a psychological exam and attended some marriage counseling, and the Department administered two lab urinary

analyses (UAs) and four or five drug tests to him at his home during the course of the service plan.[9]

In June 2008, the Department required either Mother or Father to visit K.P. each night by 6 p.m. or be fined.  The Department did that because, at the time, the Department believed it was appropriate to test the parents' ability to take care of K.P., and the 6 p.m. deadline simulated the parents' responsibility if K.P. was reunified with them but they had to place him in day care because of their work schedules.

Mother eventually found the requirements of the Program too stressful. In July 2008, after being counseled at her house by a Program team, Mother asked to leave the Program, and the trial court discharged her from it.

Mother's visits with K.P. were sporadic from June to August 2008, and Father's visits were "very minimal."  After Mother voluntarily left the Program in July 2008, the Department was unable to locate both Mother and Father until October 2008.  Other drug users lived along with Mother and Father in the house that they were renting next to Great-Grandmother.  They eventually moved out of that house because they could not pay their rent, and they began using heroin together.  They were both arrested and incarcerated for stealing

---

[9] Father tested negative on the UAs that he took, but he stopped taking them in June 2008, when he lost contact with the Department.

from Target in October 2008.  Mother was released from jail on October 31, 2008, just over a month before the start of the termination trial, and Father was released in early November.

Father theorized that the 6 p.m. visitation deadline, coupled with the other activities that the Department scheduled, created stress and caused the parents' relapses and their noncompliance with their service plans.  However, a CATS program manager testified that the parents started wanting to leave the Program in March 2008, before the Department imposed the deadline.

After her release from jail, Mother completed an inpatient detoxification program and began receiving services from Helping Open People's Eyes (HOPE).[10]  After his release from jail, Father began seeing psychiatrists and began attending appointments at MHMR and HOPE as well as church and a Bible study.

Father began working sixty to seventy hours a week as a manager at Hollywood Video about two weeks before the trial.  He worked mostly nights so he and Mother would not have to pay for day care if K.P. was returned to them.  Mother began working at Wendy's three weeks before the trial.  The

---

[10] HOPE is a Christian-based weekly outpatient drug treatment program. Mother had completed only one weekly session at the time that the trial began.

7

parents moved into Father's mother's house once they were out of jail, conditioned upon their remaining drug-free and seeking counseling.

Following a trial that began in December 2008, the trial court terminated the parents' rights in January 2009. The court found that each parent knowingly placed or allowed K.P to remain in conditions that endangered his physical or emotional well-being, engaged in conduct or placed K.P. with persons who engaged in conduct that endangered his physical or emotional well-being, and constructively abandoned K.P. while he was in the permanent or temporary managing conservatorship of the Department. The court also found that termination was in K.P.'s best interest. The parents separately filed timely notices of appeal.

### Denial of the Motions for Continuance and Extension

Initially, both parents contend that the trial court erred by denying their joint motion for an extension of the dismissal deadline.[11] In her second issue, Mother contends that the trial court also erred by denying her motion for a continuance.

---

[11] Mother and Father appeal separately. Because the issues related to a continuance and an extension are similar and the motions were made together at the trial and are briefed similarly on appeal, we will address them together.

**Continuance standards**

We review a trial court's ruling on a motion for continuance for an abuse of discretion. *See BMC Software Belg., N.V. v. Marchand*, 83 S.W.3d 789, 800 (Tex. 2002). We do not substitute our judgment for that of the trial court. *In re Nitla S.A. de C.V.*, 92 S.W.3d 419, 422 (Tex. 2002) (orig. proceeding). Instead, we must determine whether the trial court's action was so arbitrary and unreasonable as to amount to a clear and prejudicial error of law. *Joe v. Two Thirty Nine Joint Venture*, 145 S.W.3d 150, 161 (Tex. 2004).

A motion for continuance shall not be granted except for sufficient cause supported by an affidavit, through consent of the parties, or by operation of law. Tex. R. Civ. P. 251; *see In re E.L.T.*, 93 S.W.3d 372, 374 (Tex. App.—Houston [14th Dist.] 2002, no pet.). An abuse of discretion does not occur where the trial court bases its decision on conflicting evidence or when some evidence of substantive and probative character exists to support the decision. *In re D.W.*, 249 S.W.3d 625, 647 (Tex. App.—Fort Worth) (en banc), *pet. denied*, 260 S.W.3d 462 (Tex. 2008).

**Extension standards**

A trial court must dismiss a suit affecting the parent-child relationship if it has not rendered a final order or granted an extension on the first Monday after the first anniversary of the date the court rendered a temporary order

9

appointing the Department as temporary managing conservator.[12] Tex. Fam. Code Ann. § 263.401(a) (Vernon 2008). The trial court may grant an extension of up to 180 days if it finds that "extraordinary circumstances necessitate the child remaining in the temporary managing conservatorship of the department and that continuing the appointment of the department as temporary managing conservator is in the best interest of the child." *Id.* § 263.401(b). Because an extension of the dismissal date is similar to a continuance and section 263.401(b) does not specify which appellate standard of review should apply, we apply the abuse of discretion standard. *D.W.*, 249 S.W.3d at 647; *see In re J.A.*, No. 02-05-00454-CV, 2006 WL 3114434, at *9 (Tex. App.—Fort Worth Nov. 2, 2006, no pet.) (mem. op.).

**Analysis**

Mother filed for a continuance and extension because she was "currently working her service plan" and because she had completed some portions of that plan. In post-trial motions, Mother and Father separately argued, "Proceeding with trial when [Mother or Father were] so close to completing [their] services prevented [them] from showing the finder of fact that [they were] both capable

---

[12] In this case, the trial court named the Department temporary managing conservator on January 14, 2008. The trial court heard and denied the motions for a continuance and an extension on December 9, 2008, about a month before the dismissal deadline.

10

and willing to parent [their] child." Mother argues on appeal that the continuance or extension should have been granted because a 180-day delay in the trial proceedings would not have harmed K.P., and Father asserts that his medical condition and the parents' downfall allegedly caused by the Program created extraordinary circumstances that required an extension of the deadline. They do not contend that they were unprepared for the termination trial.

We have repeatedly held that when a parent, through his or her own choices, fails to comply with a service plan and then at the time of the termination trial requests a continuance or an extension of the statutory dismissal deadline in order to complete the plan, the trial court does not abuse its discretion by denying the continuance or extension. *See, e.g., In re M.M.F.*, No. 02-08-00014-CV, 2008 WL 5265033, at *13 (Tex. App.—Fort Worth Dec. 18, 2008, no pet.) (mem. op.); *see also In re A.H.*, No. 04-06-00055-CV, 2006 WL 1473696, at *1 (Tex. App.—San Antonio May 31, 2006, no pet.) (mem. op.) (holding similarly). The record demonstrates that the parents received their service plans in January 2008. Leong explained the service plans to the parents at that time. However, at the time of the trial in December 2008,

11

eleven months later, neither parent had completed his or her service plan's requirements.[13]

Mother visited K.P. regularly for the first two months after the Department placed him next door with Great-Grandmother. But when she started working, she only visited him sporadically, and she saw him only once in the four months before the trial. She dropped out of the drug court program that she had voluntarily entered.[14] She did not complete random drug tests, and she was only clean for around fifty days before the start of the trial. Mother did not significantly change her behavior until she was in jail, two months before the termination trial. She testified that the Department gave her sufficient assistance in completing her service plan but that she was still unable to do so.

Under these facts, we cannot conclude that the trial court abused its discretion by denying Mother's continuance or extension for more time to complete her service plan.

---

[13] We are reviewing here evidence relative to the termination only for purposes of evaluating the trial court's discretion in granting or denying the continuance or extension.

[14] At the trial, Mother explained about the Program, "[I]t was like everything we were doing was not right. It was like we couldn't do anything right, and I had just had enough." Father stated about the Program, "I was doing everything they wanted me to do, and it was like the harder I tried, the more I got done, the more I got yelled at and told I wasn't doing right."

Likewise, we are unpersuaded that an extension should have been granted because Father had medical issues during the time he was given to complete the service plan. Over the year Father had to complete his service plan, he was hospitalized for around thirty days and had multiple hospital visits. But he did not regularly visit K.P. when he was not in the hospital. Father last visited K.P. in July, five months before the start of the termination trial. Father also did not change his behavior and his drug use until he was in jail in October, nine months after having been given his service plan and only two months before the trial.

Statements and implications in Father's brief on this issue conflict with the record. For instance, although Father argues that "once [Mother] exited [the Program], she was written off and forgotten by the Department," the record establishes that the Department wrote letters and left messages for Mother and Father, but that the parents chose not to contact the Department. Also, although Father contends that he was excluded from the Program and was therefore "discriminated against in the most blatant fashion from the inception of the case," the evidence demonstrates that he received the benefits of the Program even though his personal desire was to not take part in the Program at all. Finally, we note that although the parents contend that an extension or continuance would not have harmed K.P., if the trial court's

13

termination decision would not have changed in the six-month interval caused by an extension, the delay would have put the Department's eventual adoption goal for K.P. (whether with Great-Grandmother or a nonrelative, as explained below) on hold.

Therefore, we hold that the trial court did not abuse its discretion by denying the parents' motions for continuance or extension. Accordingly, we overrule Mother's first and second issues, and we overrule Father's first issue.

## Legal and Factual Sufficiency

In his second issue, Father contends that the evidence is legally and factually insufficient to show that termination of his parental relationship with K.P. is in K.P.'s best interest. In her third issue, Mother contends that the evidence is factually insufficient to show that termination of her parental relationship with K.P. is in his best interest. We will discuss Father's complaint about legal and factual sufficiency together with Mother's factual sufficiency complaint.

### Standards of review

Termination of parental rights is a drastic remedy and is of such weight and gravity that due process requires the petitioner to justify termination by clear and convincing evidence. Tex. Fam. Code Ann. §§ 161.001, 161.206(a) (Vernon 2008); In re J.F.C., 96 S.W.3d 256, 263 (Tex. 2002). This

14

intermediate standard falls between the preponderance standard of ordinary civil proceedings and the reasonable doubt standard of criminal proceedings. *In re G.M.*, 596 S.W.2d 846, 847 (Tex. 1980); *In re C.S.*, 208 S.W.3d 77, 83 (Tex. App.—Fort Worth 2006, pet. denied). It is defined as the "measure or degree of proof that will produce in the mind of the trier of fact a firm belief or conviction as to the truth of the allegations sought to be established." Tex. Fam. Code Ann. § 101.007 (Vernon 2008).

**Legal sufficiency**

In reviewing the evidence for legal sufficiency in parental termination cases, we must determine whether the evidence is such that a factfinder could reasonably form a firm belief or conviction that the grounds for termination were proven. *In re J.P.B.*, 180 S.W.3d 570, 573 (Tex. 2005). We must review all the evidence in the light most favorable to the finding and judgment. *Id.* This means that we must assume that the factfinder resolved any disputed facts in favor of its finding if a reasonable factfinder could have done so. *Id.* We must also disregard all evidence that a reasonable factfinder could have disbelieved. *Id.* We must consider, however, undisputed evidence even if it is contrary to the finding. *Id.* That is, we must consider evidence favorable to termination if a reasonable factfinder could, and disregard contrary evidence unless a reasonable factfinder could not. *Id.*

15

We must therefore consider all of the evidence, not just that which favors the verdict. *Id.* But we cannot weigh witness credibility issues that depend on the appearance and demeanor of the witnesses, for that is the factfinder's province. *Id.* And even when credibility issues appear in the appellate record, we must defer to the factfinder's determinations as long as they are not unreasonable. *Id.*

**Factual sufficiency**

In reviewing the evidence for factual sufficiency, we must give due deference to the factfinder's findings and not supplant the judgment with our own. *In re H.R.M.*, 209 S.W.3d 105, 108 (Tex. 2006). We must determine whether, on the entire record, a factfinder could reasonably form a firm conviction or belief that the termination of the parent's parental rights is in the best interest of the child. *Id.*; *In re C.H.*, 89 S.W.3d 17, 25, 28 (Tex. 2002). If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction in the truth of its finding, then the evidence is factually insufficient. *H.R.M.*, 209 S.W.3d at 108.

**Applicable law**

A parent's rights to "the companionship, care, custody, and management" of his or her children are constitutional interests "far more precious than any property right." *Santosky v. Kramer,* 455 U.S. 745, 758–59, 102 S. Ct. 1388, 1397 (1982); *In re M.S.,* 115 S.W.3d 534, 547 (Tex. 2003). "While parental rights are of constitutional magnitude, they are not absolute. Just as it is imperative for courts to recognize the constitutional underpinnings of the parent-child relationship, it is also essential that emotional and physical interests of the child not be sacrificed merely to preserve that right." *C.H.,* 89 S.W.3d at 26.

In a termination case, the State seeks not just to limit parental rights but to end them permanently—to divest the parent and child of legal rights, privileges, duties, and powers normally existing between them, except for the child's right to inherit. Tex. Fam. Code Ann. § 161.206(b); *Holick v. Smith,* 685 S.W.2d 18, 20 (Tex. 1985). We strictly scrutinize termination in favor of the parent. *Holick,* 685 S.W.2d at 20–21; *In re E.M.N.,* 221 S.W.3d 815, 820 (Tex. App.—Fort Worth 2007, no pet.).

In proceedings to terminate the parent-child relationship brought under section 161.001 of the family code, the petitioner must prove that termination

17

is in the best interest of the child.[15]  Tex. Fam. Code Ann. § 161.001(2); *see*

*In re J.L.,* 163 S.W.3d 79, 84 (Tex. 2005).  There is a strong presumption that

keeping a child with a parent is in the child's best interest.  *In re R.R.*, 209

S.W.3d 112, 116 (Tex. 2006).  Prompt and permanent placement of the child

in a safe environment is also presumed to be in the child's best interest.  Tex.

Fam. Code Ann. § 263.307(a) (Vernon 2008).  In determining a child's best

interest, courts should consider whether there is a history of substance abuse

by the child's family or others who have access to the child's home and

whether the child's family demonstrates adequate parenting skills.  *Id.* §

263.307(b)(8), (12).

Other factors that the trier of fact in a termination case may use in

determining the best interest of the child include:

(1)     the desires of the child;

(2)     the emotional and physical needs of the child now and in the
        future;

(3)     the emotional and physical danger to the child now and in the
        future;

(4)     the parental abilities of the individuals seeking custody;

---

[15] A petitioner must also prove that the parent has violated one of the
provisions contained in section 161.001(1) of the family code.  *See* Tex. Fam.
Code Ann. § 161.001(1).  However, neither parent has challenged the trial
court's findings under that subsection.

18

(5)  the programs available to assist these individuals to promote the best interest of the child;

(6)  the plans for the child by these individuals or by the agency seeking custody;

(7)  the stability of the home or proposed placement;

(8)  the acts or omissions of the parent which may indicate that the existing parent-child relationship is not a proper one; and

(9)  any excuse for the acts or omissions of the parent.

*Holley v. Adams*, 544 S.W.2d 367, 371–72 (Tex. 1976).

Undisputed evidence of just one factor may be sufficient in a particular case to support a finding that termination is in the best interest of the child. *C.H.*, 89 S.W.3d at 27. On the other hand, the presence of scant evidence relevant to each factor will not support such a finding. *Id.* Some listed factors may be inapplicable to some cases; other factors not on the list may also be considered when appropriate. *Id.* For this reason, we will only discuss the factors which were made relevant by the evidence submitted at the trial and will combine our analysis of factors where the evidence may concurrently apply.

**Analysis**

**The desires of K.P. and the parental abilities of Mother and Father**

K.P. was less than a year old at the beginning of the termination trial and could not therefore specifically express his desires. However, testimony indicated that he had not bonded emotionally with the parents because they did not visit him consistently. Even though K.P. was in the house next door to the parents throughout much of the time of this case, they did not always visit when they were home.

When the parents did visit K.P., they did not give K.P. all of their attention. For example, they sometimes talked on their cell phones or sent text messages while visiting K.P. Great-Grandmother testified that when Mother was with K.P., sometimes she "would play with him and then sometimes she would pass him off to [Father] and not want to have anything to do with him." Great-Grandmother also said that Mother would sometimes "just lay [K.P.] on the couch . . . and walk off."

As the parents' case with the Department progressed, the parents visited K.P. with decreasing frequency. Mother visited K.P. fourteen times in May 2008, twelve times in June, eight times in July, and just four times through half of August. Mother visited K.P. only once from mid-August to the beginning of

20

the trial in December 2008, and she did not make contact with her caseworker at all from the middle of August until the end of October of that year.

Father visited K.P. ten times in May, four times in June, six times in July, and just once in the first half of August. Father also lost complete contact with the Department's caseworker from August until October 2008. Although the evidence demonstrated that Mother and Father made better attempts to visit K.P. in the month preceding the trial, conflicting schedules of the parents with the Department and K.P. being sick blocked those attempts.

Mother cited "[w]ork reasons and depression" as the reasons she did not visit K.P. Father stated that his work schedule and drug treatment conflicted with him visiting K.P. He thought that it was impossible to complete all of the tasks that the Department had requested.

Mother even said at one point that she did not want K.P. and did not love him. She once told her caseworker that she did not feel bonded with K.P. and that she wanted to go back to Kerrville to be with her other children.

**The stability of the parents' home and the plans for K.P. by those seeking custody**

At the time of the trial, the parents had been living with Father's mother and her fiancé in her two-bedroom duplex for just over a month. To remain there, Mother and Father must stay free of drugs (which they have been unable

21

to do for any significant length of time) and obtain counseling. Father's mother has a history of using drugs, although she had not used drugs in the five years preceding the trial. Her fiancé has a conviction for assault.

After moving out of the house next to Great-Grandmother in September, until moving in with Father's mother in November, Mother lived in her car and in motels. Mother stated that the house that she and Father had lived in next to Great-Grandmother was not stable—it had broken windows and floors, and it was not suitable for children.

By comparison, Great-Grandmother, whom K.P. remained with at the time of the trial, was attentive to K.P.'s emotional needs, was in compliance with the Department's plans for him, and was providing him a stable home. Great-Grandmother testified that at the time of the trial, K.P. was "a happy little boy and [he was] very healthy." Great-Grandmother was making plans to adopt K.P., and the Department's only concerns about those plans was Great-Grandmother's age (she was 72 years old at the time of the trial) and whether Great-Grandmother could support K.P. financially until he was eighteen years old. Mother testified that if her rights to K.P. were terminated, she wanted Great-Grandmother to continue to care for K.P. If the Department determined that Great-Grandmother could not provide for K.P.'s long-term needs, it planned on allowing a nonrelative to adopt K.P.

Mother provided some financial support for K.P. while Great-Grandmother took care of him, but she last bought diapers for him in June 2008, six months before the trial. At the time of the trial, the parents had not made plans for a car seat or a crib if the court returned K.P. to them, although it seemed that these items could be easily obtained.

**The present and future potential for emotional and physical danger to K.P., the acts or omissions of the parents which may indicate that their relationship with K.P. is not proper, any excuse for the parents' acts or omissions, and the programs available to assist the parents**

The parents have long-standing, persistent drug problems. For instance, Mother used cocaine for several years before K.P.'s birth. She also used methamphetamine on and off since 2002. Mother and Father used heroin together in July 2008, while K.P. was in the custody of the Department.

Mother admitted that, as a parent, using those types of controlled substances endangers her child. But she used ecstasy in June 2008 and heroin in September 2008 and again in October 2008, after completing her detoxification program and just before going to jail.

The Department requested that Mother complete inpatient treatment for her drug problems, but she declined doing so because she had a "fear of confinement and she felt that she could be more successful with an outpatient program." Mother had a support group and was seeking treatment for her drug

23

use through MHMR, HOPE and Narcotics Anonymous (NA) at the time of the trial,[16] and she had been drug-free for around two months. However, she had participated in similar programs in the past, including completing CATS in 2007, participating in drug treatment in early 2008, and completing a detoxification program in October 2008, and she had relapsed after her involvement in all three of those courses of treatment. The trial court could have reasonably inferred that she would relapse again. *See Williams v. Williams*, 150 S.W.3d 436, 451 (Tex. App.—Austin 2004, pet. denied); *In re K.A.S.*, 131 S.W.3d 215, 230 (Tex. App.—Fort Worth 2004, pet. denied) (explaining that a trial court "is not required to believe that there has been a lasting change in a parent's attitude").

Mother did not take full advantage of the treatment available for her. She completed her psychological evaluation and her parenting classes, but she did not, as required by the service plan, complete all of her substance abuse classes, complete CATS after-care,[17] consistently maintain an NA sponsor, or

---

[16] Mother went to fifteen NA sessions from November 11, 2008 to December 17, 2008.

[17] A Department representative explained, "After-care is just as important as going to the groups, because after-care helps set a foundation for sustained sobriety."

take some random UAs. A permanency progress report indicates that most of Mother's problems with the service plan began to arise in July 2008.

During the Department's involvement with K.P., Mother cut herself (including as recently as October 2008), and during a cross-examination, Mother admitted to having had suicidal thoughts since K.P's removal. According to Great-Grandmother, Mother and Father may have also stolen Great-Grandmother's bank card and emptied her checking account. Mother admitted that the words "drug-using, drug-seeking, and not stable" were appropriate to describe her behavior just before the termination trial began.

Father admitted to using heroin as far back as 2005, and he has been using drugs in general since he was fourteen years old. He conceded that he smoked marijuana and used heroin before K.P.'s birth, and he admitted that he used heroin within two months of the trial date. He told Great-Grandmother that he also used ecstasy. He knew about Mother's drug use while she was pregnant with K.P., but he said and did nothing about it. He also has a long criminal history—he received deferred adjudication for a felony drug charge in 1999, pled guilty to driving under the influence of drugs in that same year, and pled guilty to separate thefts he committed in September and October 2008, just months before the termination trial. Mother also pled guilty to the October 2008 theft.

Although Father blamed the schedule of the Department's treatment programs and its employees for his relapse, he admitted that his relapse did not occur until around the time that Mother left the Program, and he conceded that he continued to use drugs (and stole from Target) after the stress that he alleged the Program caused was removed. Also, like Mother, although Father was seeking treatment for his drug use at the time of the trial, he had previously participated in drug treatment programs and had relapsed after completing those programs, including relapsing after a detoxification program in October 2008.

Father's poor choices are also reflected by his selling some prescription drugs to one of his friends and knocking holes in walls because he was angry with Mother. When Father was asked by the Department's attorney whether his using drugs and stealing endangered K.P., Father responded, "I refuse to answer any more questions."

**Our holding**

We hold that these facts, considered under the *Holley* factors and viewed in the light most favorable to the trial court's judgment, enabled the trial court to reasonably form a firm conviction or belief that termination of Father's parental rights was in K.P.'s best interest. *See Holley*, 544 S.W.2d at 371–72. Therefore, we hold that the evidence was legally sufficient to support the trial

26

court's best interest finding as to Father. *See J.P.B.*, 180 S.W.3d at 573. We also hold that, giving due deference to the trial court's determination, the evidence is factually sufficient to support the trial court's judgment terminating both parents' rights because the trial court could reasonably form a firm conviction or belief that termination is in K.P.'s best interest. *See C.H.*, 89 S.W.3d at 28. Accordingly, we overrule Father's second issue and Mother's third issue.

## Conclusion

Having overruled all of Mother's and Father's issues, we affirm the trial court's order terminating their parental rights to K.P.

TERRIE LIVINGSTON
JUSTICE

PANEL:  LIVINGSTON, MCCOY, and MEIER, JJ.

DELIVERED: August 13, 2009